ROBBINS ARROYO LLP
BRIAN J. ROBBINS (190264)
brobbins@robbinsarroyo.com
CRAIG W. SMITH (164886)
csmith@robbinsarroyo.com
STEVEN R. WEDEKING (235759)
swedeking@robbinsarroyo.com
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| WAYNE BONNER, Derivatively on Behalf of AMYRIS, INC., | Case No. |
| Plaintiff, | VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF |
| v. | SECURITIES LAW, BREACH OF FIDUCIARY DUTY, WASTE OF |
| JOHN DOERR, JOHN G. MELO, FRANK KUNG, KATHLEEN VALIASEK, GEOFFREY DUYK, CAROLE PIWNICA, R. NEIL WILLIAMS, PATRICK YANG, PHILIP EYKERMAN, CHRISTOPH GOPPELSROEDER, STEVEN MILLS, ABDULLAH BIN KHALIFA AL THANI, CHRISTOPHE VUILLEZ, and FERNANDO DE CASTRO REINACH, | CORPORATE ASSETS, AND UNJUST ENRICHMENT |
| Defendants, | |
| -and- | |
| AMYRIS, INC., a Delaware corporation, | |
| Nominal Defendant. | DEMAND FOR JURY TRIAL |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff, by his attorneys, submits this Stockholder Verified Derivative Complaint for Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge.  This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant Amyris, Inc. ("Amyris" or the "Company") against certain of its officers and directors for violation of securities law, breach of fiduciary duty, waste of corporate assets, and unjust enrichment. These wrongs resulted in hundreds of millions of dollars in damages to Amyris's reputation, goodwill, and standing in the business community.  Moreover, these actions have exposed Amyris to hundreds of millions of dollars in potential liability for violations of state and federal law.

2.      This case arises out of the Individual Defendants' (as defined herein) responsibility for a series of inaccurate and improper statements.  In particular, the Individual Defendants utilized a new accounting rule to record estimated future royalty revenues due from one of its largest customers.  These estimated future payments drove the Company's revenues to new records, which the Individual Defendants claimed would continue to increase throughout the year.  The market reacted positively to the Individual Defendants' rosy financial projections and the Company's stock price increased from $5.58 per share on March 15, 2018, to close at $9.20 per share on October 9, 2018, shortly before the truth emerged.

3.      During this time, Amyris was operating with a disclosed material weakness in its internal controls over financial reporting related to "a lack of sufficient resources … to be able to adequately identify, record, and disclose non-routine transactions," which the Company first disclosed on November 20, 2017.  Despite knowledge, the Individual Defendants failed to rectify this material weakness (which still remains to date) and nonetheless began ambitiously applying a new accounting rule to estimate and record license and royalty revenue.  Not only that, there were also undisclosed

material weaknesses in Amyris's internal controls over financial reporting which had led to improper statements and revenue recognition.

4. As would slowly be revealed between November 2018 and April 2019, Amyris was grossly overestimating license and royalty revenue due from its largest customer, was operating with an undisclosed material weakness in its internal controls, and would need to restate a number of financial statements. On April 11, 2019, the Individual Defendants announced that Company needed to restate the financial statements in its Quarterly Reports filed in 2018. In explaining these restatements, the Individual Defendants admitted to material errors in estimating royalty revenue under the new accounting rule. They also admitted that undisclosed material weaknesses in the Company's internal controls over financial reporting existed. Later, on May 16, 2019, the Company announced that it would also need to restate its 2017 Annual Report due to additional accounting errors being unearthed. Amyris further announced that investors should not rely upon management's assessment of internal controls in the 2017 Annual Report, reiterating that the Company expects to report additional material weaknesses. Further, due to the Individual Defendants' oversight and accounting failures, Amyris has been unable to file its Annual Report for 2018.

5. The Individual Defendants' faithless actions and repeated improper statements have devastated Amyris's credibility as reflected by the Company's more than $328 million, or 70%, market capitalization loss from a high of over $463 million in October 2018, to approximately $135 million at present.

6. As a direct result of this unlawful course of conduct, Amyris is now the subject of at least one federal securities class action lawsuit filed in the U.S. District Court for the Northern District of California on behalf of investors who purchased Amyris's shares (the "Securities Class Action"). The Securities Class Action brings claims against Amyris and certain of the Individual Defendants in connection with the Company's improper statements concerning its accounting practices and internal controls, including causes of action under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

7. In addition, certain of the Individual Defendants have profited from their improper statements, unlawfully reaping over $54 million in illegal insider trading proceeds of Company stock

1  while it traded at artificially inflated rates.  In addition, during this time, certain Individual Defendants

2  collectively pocketed millions of dollars in executive compensation and directors' fees not justified by

3  Amyris's actual performance while under their stewardship.  Amyris paid lucrative executive

4  compensation bonuses to certain Individual Defendants based on the Company's achievement of revenue

5  and other financial metrics misstated by the Individual Defendants.

6       8.     On April 27, 2018, certain of the Individual Defendants negligently issued a materially

7  false and misleading Proxy Statement (the "2018 Proxy") urging stockholders to reelect certain directors

8  as well as approve the issuance of Chief Executive Officer equity awards (the "CEO Equity Awards").

9  In support of the bid to reelect certain directors, the 2018 Proxy assured Amyris's stockholders the Board

10  of Directors (the "Board") actively monitored the Company's risk exposure, including financial control

11  risks and risks associated with compensation plans.  In reality, the Board was utterly failing in its

12  oversight duties by allowing the Company to operate with inadequate internal controls.  In addition,

13  contrary to claimed oversight of risks associated with compensation plans, the Board promoted lucrative

14  executive compensation plans that incentivized and resulted in fabricated financial results.

15       9.     Under the 2018 Proxy's CEO Equity Awards proposal, defendant John G. Melo ("Melo"),

16  Amyris's current CEO and director, was granted stock options and a restricted stock unit award for

17  700,000 shares of Amyris common stock.  In support of this proposal, the 2018 Proxy falsely assured

18  stockholders that defendant Melo's interests were aligned with the Company's long-term strategic

19  direction as well as tied to the stockholders.  In truth, however, defendant Melo was overstating the

20  Company's revenue and manipulating other financial metrics to achieve performance targets tied to

21  lucrative bonus awards.  These short-term business decisions had eroded his ties with the Company's

22  stockholders and Amyris's long-term strategic direction.  Stockholders voted to approve the CEO Equity

23  Awards, which resulted in the issuance of 700,000 Amyris shares to defendant Melo despite his

24  breaches of fiduciary duties.

25       10.    By this action, plaintiff seeks to rectify the conduct of the individuals bearing ultimate

26  responsibility for the harm to the Company—the members of the Board and certain officers—to impose

27  responsibility upon those individuals, and to recover damages sustained by Amyris due to the Individual

28  Defendants' violation of securities law, breaches of fiduciary duty, unjust enrichment, and waste of

corporate assets.

## JURISDICTION AND VENUE

11.     Pursuant to 28 U.S.C. §1331 and section 27 of the Exchange Act, this Court has jurisdiction over the claims asserted herein for violations of section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

12.     This court has jurisdiction over each defendant named herein because each defendant conducts business in this District, or is an individual with sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) one or more of the defendants either resides in or maintains executive offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Amyris, occurred in this District; and (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## INTRADISTRICT ASSIGNMENT

14.     A substantial portion of the transactions and wrongdoings which give rise to the claims in this action occurred in the County of Alameda, and as such, this action is properly assigned to the Oakland division of this Court.

## THE PARTIES

**Plaintiff**

15.     Plaintiff Wayne Bonner was a stockholder of Amyris at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Amyris stockholder.

**Nominal Defendant**

16.     Nominal defendant Amyris is a Delaware corporation with principal executive offices located at 5885 Hollis Street, Suite 100, Emeryville, California.  Amyris is an industrial biotechnology

company that utilizes its technology platform to engineer, manufacture, and sell products into the Health & Wellness, Clean Skincare, and Flavors & Fragrances markets.  The platform engineers microbes to be used as catalysts to metabolize renewable sugars into large-volume ingredients.  Amyris has successfully developed five distinct molecules at commercial volumes.  As of December 31, 2017, The Company had approximately 414 full-time employees.

**Defendants**

17.     Defendant John Doerr ("Doerr") is an Amyris director and has been since May 2006.  Defendant Doerr knowingly or recklessly: (i) failed to implement and maintain adequate internal controls over accounting and financial reporting at Amyris; and (ii) failed to ensure the timely and accurate filing of Amyris's public statements concerning the Company's financial results, business prospects, internal controls, risk oversight, and CEO Equity Awards.  While in possession of material, nonpublic information concerning Amyris's true business health, defendant Doerr sold over 4.87 million shares of his stock for over $30.33 million in proceeds.  Amyris paid defendant Doerr the following compensation as a director:[1]

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2017 | $50,923 | $4,453 | $5,190 | $60,566 |

18.     Defendant Melo is Amyris's CEO and a director and has been since January 2007 and President and has been since June 2008.  Defendant Melo is named as a defendant in the Securities Class Action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Melo knowingly, recklessly, or with gross negligence: (i) failed to implement and maintain adequate internal controls over accounting and financial reporting at Amyris; and (ii) failed to ensure the timely and accurate filing of Amyris's public statements concerning the Company's financial results, business

---

[1] Due to the Individual Defendants' failures, Amyris has not filed a Proxy Statement since April 27, 2018.  As a result, plaintiff does not know and is prevented from including herein the compensation paid by Amyris to each of the Individual Defendants in 2018.  Accordingly, plaintiff includes only the known compensation each Individual Defendant received from Amyris while noting that these representations are incomplete and may not reflect the defendant's compensation during the time of the wrongdoing alleged herein.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

prospects, internal controls, risk oversight, and CEO Equity Awards. While in possession of material, nonpublic information concerning Amyris's true business health, defendant Melo sold 27,550 shares of his stock for $186,655.55 in proceeds. Amyris paid defendant Melo the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2017 | $579,167 | $640,000 | $147,465 | $43,930 | $581,948 | $934 | $1,993,444 |

19. Defendant Frank Kung ("Kung") is an Amyris director and has been since November 2017. Defendant Kung knowingly or recklessly: (i) failed to implement and maintain adequate internal controls over accounting and financial reporting at Amyris; and (ii) failed to ensure the timely and accurate filing of Amyris's public statements concerning the Company's financial results, business prospects, internal controls, risk oversight, and CEO Equity Awards. While in possession of material, nonpublic information concerning Amyris's true business health, defendant Kung sold over 3.92 million shares of his stock for over $24.40 million in proceeds. Amyris paid defendant Kung the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|-------------|-------------------|--------------|---------------|-------|
| 2017 | $6,522 | $6,380 | $9,481 | $22,383 |

20. Defendant Kathleen Valiasek ("Valiasek") is Amyris's Chief Business Officer since June 3, 2019. Defendant Valiasek was Amyris's Chief Financial Officer ("CFO") since January 2017 to June 3, 2019. Defendant Valiasek is named as a defendant in the Securities Class Action complaint that alleges she violated sections 10(b) and 20(a) of the Exchange Act. Defendant Valiasek knowingly, recklessly, or with gross negligence: (i) failed to implement and maintain adequate internal controls over accounting and financial reporting at Amyris; and (ii) failed to ensure the timely and accurate filing of Amyris's public statements concerning the Company's financial results, business prospects, internal controls, risk oversight, and CEO Equity Awards. Amyris paid defendant Valiasek the following compensation as an executive:

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

| Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2017 | $398,686 | $45,000 | $137,623 | $126,996 | $163,085 | $4,310 | $875,700 |

21.     Defendant Geoffrey Duyk ("Duyk") is Amyris's interim Chairman of the Board and has been since May 2014 and a director and has been since May 2012.  Defendant Duyk is also a member of Amyris's Audit Committee and has been since at least April 2018.   Defendant Duyk knowingly or recklessly: (i) failed to implement and maintain adequate internal controls over accounting and financial reporting at Amyris; and (ii) failed to ensure the timely and accurate filing of Amyris's public statements concerning the Company's financial results, business prospects, internal controls, risk oversight, and CEO Equity Awards.  Amyris paid defendant Duyk the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|-------------|-------------------|---------------|-------|
| 2017 | $23,750 | $0 | $23,750 |

22.     Defendant Carole Piwnica ("Piwnica") is an Amyris director and has been since September 2009.  Defendant Piwnica knowingly or recklessly: (i) failed to implement and maintain adequate internal controls over accounting and financial reporting at Amyris; and (ii) failed to ensure the timely and accurate filing of Amyris's public statements concerning the Company's financial results, business prospects, internal controls, risk oversight, and CEO Equity Awards.  Amyris paid defendant Piwnica the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|-------------|-------------------|--------------|---------------|-------|
| 2017 | $54,500 | $4,453 | $5,190 | $64,143 |

23.     Defendant R. Neil Williams ("Williams") is an Amyris director and has been since May 2013.  Defendant Williams is also the Chairman and a member of Amyris's Audit Committee and has been since at least April 2017.  Defendant Williams knowingly or recklessly: (i) failed to implement and maintain adequate internal controls over accounting and financial reporting at Amyris; and (ii) failed to ensure the timely and accurate filing of Amyris's public statements concerning the Company's financial results, business prospects, internal controls, risk oversight, and CEO Equity Awards.  Amyris paid defendant Williams the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2017 | $70,000 | $4,453 | $5,190 | $79,643 |

24.     Defendant Patrick Yang ("Yang") is an Amyris director and has been since July 2014. Defendant Yang knowingly or knowingly or recklessly: (i) failed to implement and maintain adequate internal controls over accounting and financial reporting at Amyris; and (ii) failed to ensure the timely and accurate filing of Amyris's public statements concerning the Company's financial results, business prospects, internal controls, risk oversight, and CEO Equity Awards.  Amyris paid defendant Yang the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2017 | $43,104 | $4,453 | $5,190 | $52,747 |

25.     Defendant Philip Eykerman ("Eykerman") is an Amyris director and has been since May 2017.  Defendant Eykerman knowingly or recklessly: (i) failed to implement and maintain adequate internal controls over accounting and financial reporting at Amyris; and (ii) failed to ensure the timely and accurate filing of Amyris's public statements concerning the Company's financial results, business prospects, internal controls, risk oversight, and CEO Equity Awards.  Amyris paid defendant Eykerman the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2017 | $24,835 | $13,153 | $14,262 | $52,250 |

26.     Defendant Christoph Goppelsroeder ("Goppelsroeder") is an Amyris director and has been since November 2017.  Defendant Goppelsroeder knowingly or recklessly: (i) failed to implement and maintain adequate internal controls over accounting and financial reporting at Amyris; and (ii) failed to ensure the timely and accurate filing of Amyris's public statements concerning the Company's financial results, business prospects, internal controls, risk oversight, and CEO Equity Awards.  Amyris paid defendant Goppelsroeder the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Total |
|---|---|---|
| 2017 | $6,522 | $6,522 |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

27.     Defendant Steven Mills ("Mills") is an Amyris director and has been since August 2018. Defendant Mills was also Amyris's CFO and from May 2012 to December 2013 and Principal Accounting Officer from May 2012 to August 2013.  Defendant Mills is also a member of Amyris's Audit Committee and has been since August 2018.  Defendant Mills knowingly or recklessly: (i) failed to implement and maintain adequate internal controls over accounting and financial reporting at Amyris; and (ii) failed to ensure the timely and accurate filing of Amyris's public statements concerning the Company's financial results, business prospects, internal controls, risk oversight, and CEO Equity Awards.

28.     Defendant Abdullah bin Khalifa Al Thani ("Al Thani") was an Amyris director from March 2012 to May 14, 2019.  Defendant Al Thani knowingly or recklessly: (i) failed to implement and maintain adequate internal controls over accounting and financial reporting at Amyris; and (ii) failed to ensure the timely and accurate filing of Amyris's public statements concerning the Company's financial results, business prospects, internal controls, risk oversight, and CEO Equity Awards.  Amyris paid defendant Al Thani the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2017 | $40,000 | $4,453 | $5,190 | $49,643 |

29.     Defendant Christophe Vuillez ("Vuillez") was an Amyris director from November 2016 to May 20, 2019.  Defendant Vuillez knowingly or recklessly: (i) failed to implement and maintain adequate internal controls over accounting and financial reporting at Amyris; and (ii) failed to ensure the timely and accurate filing of Amyris's public statements concerning the Company's financial results, business prospects, internal controls, risk oversight, and CEO Equity Awards.  Amyris paid defendant Vuillez the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2017 | $40,000 | $0 | $0 | $40,000 |

30.     Defendant Fernando de Castro Reinach ("Reinach") was an Amyris director from September 2008 to August 2018.  Defendant Reinach was also a member of Amyris's Audit Committee from at least April 2017 to July 2018.  Defendant Reinach knowingly or recklessly: (i) failed to implement and maintain adequate internal controls over accounting and financial reporting at Amyris;

1    and (ii) failed to ensure the timely and accurate filing of Amyris's public statements concerning the

2    Company's financial results, business prospects, internal controls, risk oversight, and CEO Equity

3    Awards.  Amyris paid defendant Reinach the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2017 | $47,500 | $4,453 | $5,190 | $57,143 |

6        31.    The defendants identified in ¶¶18, 20 are referred to herein as the "Officer Defendants."

7    The defendants identified in ¶¶17-19, 21-30 are referred to herein as the "Director Defendants."  The

8    defendants identified in ¶¶21, 23, 27, 30 are referred to herein as the "Audit Committee Defendants."

9    The defendants identified in ¶¶17-19 are referred to herein as the "Insider Selling Defendants."

10   Collectively, the defendants identified in ¶¶17-30 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

13       32.    By reason of their positions as officers and directors of the Company, each of the

14   Individual Defendants owed and owe Amyris and its stockholders fiduciary obligations of trust, loyalty,

15   good faith, and due care, and were and are required to use their utmost ability to control and manage

16   Amyris in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to

17   act in furtherance of the best interests of Amyris and not in furtherance of their personal interest or

18   benefit.

19       33.    To discharge their duties, the officers and directors of Amyris were required to exercise

20   reasonable and prudent supervision over the management, policies, practices, and controls of the

21   financial affairs of the Company.  By virtue of such duties, the officers and directors of Amyris were

22   required to, among other things:

23       (a)    ensure that the Company was operated in a diligent, honest, and prudent manner

24   in compliance with all applicable laws, rules, and regulations;

25       (b)    ensure that the Company complied with its legal obligations and requirements—

26   including requirements involving the filing of accurate financial and operational information with the

27   SEC—and refrain from engaging in insider trading and other deceptive conduct;

28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

(c)      truthfully and accurately guide the Company's stockholders and the public when speaking about the Company's revenues and financial condition;

(d)      conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(e)      remain informed as to how Amyris conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**Amyris's Code of Business Conduct and Ethics**

34.      In addition, the Company has adopted a Code of Business Conduct and Ethics (the "Code") that is "applicable to every employee, officer and director of the Company."  The Company "expect[s] all of [its] directors, executives, managers and other supervisory personnel to help foster a sense of commitment to this [Code] among all [the] employees, and to foster a culture of fairness, honesty and accountability within the Company."  Further, each of the Individual Defendants have a "responsibility to read and understand this [Code], and to use it as a guide to the performance of [their] responsibilities for the Company," and "[a]nyone who violates the standards in this [Code] will be subject to disciplinary action, which, in appropriate circumstances, may include termination of employment for cause, legal action or referral for criminal prosecution."

35.      The Code further requires that the Individual Defendants follow the Company's Legal Compliance Policy which states:

> You must always obey the law while performing your duties to the Company. You also must always comply with the Company's policies. Our success depends upon each employee, officer and director (a "***Covered Person***") operating within legal guidelines and cooperating with authorities. It is essential that you know and understand the legal and regulatory requirements that apply to our business and to your specific area of responsibility. While you are not expected to have complete mastery of these laws, rules and regulations, you are expected to be able to recognize situations that require you to consult with others to determine the appropriate course of action. If you have a question

in the area of legal compliance, you should approach your supervisor or the Compliance Officer immediately.

36.    The Code also requires that the Company's books, records, finances, and public disclosures be "fair," "accurate," and "[not] misleading."  The Code's "Maintenance of Corporate Books, Records, Documents and Accounts; Financial Integrity; Public Reporting" states:

We strive to maintain integrity of our records and public disclosure. Our corporate and business records, including all supporting entries to our books of account, must be completed honestly, accurately and understandably. Our records are important to investors and creditors. They serve as a basis for managing our business and are important in meeting our obligations to customers, suppliers, creditors, employees and others with whom we do business. We depend on our books, records and accounts accurately and fairly reflecting our assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities.

To help ensure the integrity of our records and public disclosure, we require that:

- no entry be made in our books and records that is intentionally false or misleading;

- transactions be supported by appropriate documentation;

- the terms of sales and other commercial transaction be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in our books and records;

- employees comply with our system of internal controls and be held accountable for their entries;

- any off-balance sheet arrangements of the Company are clearly and appropriately disclosed;

- no cash or other assets be maintained for any purpose in any unrecorded or "off-the-books" fund; and

- records be retained or destroyed according to the Company's document retention policies or procedures then in effect.

Our disclosure controls and procedures are designed to help ensure that the Company's reports and documents filed with or submitted to the United States Securities and Exchange Commission (the "*SEC*") and other public disclosures are full, fair and accurate, that they fairly present our financial condition and results of operations, and that they are timely and understandable. Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should adhere to all disclosure controls and procedures and generally assist the Company in producing financial disclosures that contain all of the information about the Company

that is required by law and would be important to enable investors to understand our business and its attendant risks. In particular:

- No employee may take or authorize any action that would cause the Company's financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;

- All employees must cooperate fully with our finance department, as well as our independent public accountants and counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that the Company's books and records, as well as its reports filed with the SEC, are accurate and complete; and

- No employee should knowingly make (or encourage any other person to make) any false or misleading statement in any of the Company's reports filed with the SEC or knowingly omit (or encourage any other person to omit) any information necessary to make the disclosure in any of such reports accurate in all material respects.

If you become aware that our public disclosures are not full, fair and accurate, or if you become aware of a transaction or development that you believe may require disclosure, you should report the matter immediately to your supervisor, or the Compliance Officer.

37.    The Code further proscribes special responsibilities to the CEO and Senior Financial Officers relating to ethical conduct and compliance.  The Code states:

While we expect honest and ethical conduct in all aspects of our business from all of our employees, special ethical obligations apply to our Chief Executive Officer and members of our Finance Department. They must adhere to the following principles and foster a culture throughout the Company as a whole that helps to ensure the fair and timely reporting of our financial results and condition:

- Act with honesty and integrity, maintain high standards of ethical conduct and use due care and diligence in performing their responsibilities to the Company, without allowing their independent judgment to be subordinated to personal interest.

- Avoid situations that represent actual or apparent conflicts of interest with their responsibilities to the Company, and disclose promptly to the General Counsel or Audit Committee any transaction or personal or professional relationship that reasonably could be expected to give rise to such an actual or apparent conflict.

- Provide information that is full, fair, accurate, timely and understandable for inclusion in the Company's financial statements and other disclosure in the reports and documents that the Company files with the SEC or otherwise discloses publicly in the Company's submissions to governmental agencies or in public statements.

- 13 -

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

- Comply and take all reasonable actions to cause others under their supervision to comply with applicable laws, rules, and regulations of government authorities.

- Respect and safeguard the confidentiality of information acquired in the course of their work, except when authorized or legally obligated to disclose such information, and not use confidential information acquired in the course of work for personal advantage.

- Share knowledge with colleagues and maintain skills that are important and relevant to the performance of their duties.

- Proactively promote ethical behavior as a responsible partner among peers in the work environment.

- Achieve responsible use of and control over all entrusted assets and resources.

- Report known violations of this Code of Ethics to the General Counsel or Audit Committee.

38.     Finally, the Code states that it is the "responsibility" of the Individual Defendants to report "a suspected or actual violation of the [Code] standards by others."  The Code states:

***Clarifying Questions and Concerns; Reporting Possible Violations***

If you encounter a situation or are considering a course of action and its appropriateness is unclear, discuss the matter promptly with your supervisor or the Compliance Officer; even the appearance of impropriety can be very damaging to the Company and should be avoided. If you are aware of a suspected or actual violation of Code of Ethics standards by others, you have a responsibility to report it. You should raise questions or report potential violations of this Code of Ethics without any fear of retaliation in any form – it is our policy not to retaliate in such circumstances and we will take prompt disciplinary action, up to and including termination of employment for cause, against any employee who retaliates against you.

Supervisors must promptly report any complaints or observations of Code of Ethics violations to the Compliance Officer. The Compliance Officer will investigate all reported possible Code of Ethics violations promptly and with the highest degree of confidentiality that is possible under the specific circumstances. As needed, the Compliance Officer will consult with the Legal Department, the Human Resources Department, the Nominating and Governance Committee and/or Audit Committee.

If the investigation indicates that a violation of this Code of Ethics has probably occurred, we will take such action as we believe to be appropriate under the circumstances.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**Additional Duties of the Audit Committee Defendants**

39.     In addition to these duties, under the Audit Committee Charter, the Audit Committee Defendants, defendants Duyk, Williams, Mills, and Reinach, owed specific duties to Amyris to assist the Board in overseeing "the Company's accounting and system of internal controls."  The Audit Committee Defendants are also responsible for overseeing "the quality and integrity of the Company's financial reports."  Moreover the Audit Committee's Charter provides:

In order to fulfill its purpose, the Audit Committee is to:

- oversee the Company's accounting and financial reporting processes and audits of Company's consolidated financial statements

- oversee the Company's relationship with its independent auditors ("***Independent Auditors***"), including appointing or changing Company's auditors and ensuring their independence;

- facilitate communication among the Independent Auditors and the Company's financial and senior management and the Board; and

- monitor the periodic reviews of the adequacy of the accounting and financial reporting processes and systems of internal control that are conducted by the Independent Auditors and the Company's financial and senior management.

*   *   *

**III.     RESPONSIBILITIES AND DUTIES**

*   *   *

The Committee will:

**Financial Statements and Disclosures**

1. Review and discuss with management the Company's quarterly results and the related earnings press release prior to distribution to the public.

2. Review the Company's quarterly and annual financial statements, including any report on the Company's internal control over financial reporting, and any report or opinion by the Independent Auditors.

3. In connection with the Committee's review of the annual financial statements:

- discuss the financial statements and the results of the Independent Auditors' audit of the financial statements with the Independent Auditors and management;

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

- discuss any items required to be communicated by the Independent Auditors in accordance with the applicable requirements of the Public Company Accounting Oversight Board; and

- discuss with the Company's management and the Independent Auditors the Company's selection, application and disclosure of critical accounting policies and practices.

4. Recommend to the Board whether the annual financial statements should be included in the Company's Annual Report on Form 10-K.

5. In connection with the Committee's review of the quarterly financial statements:

- discuss with the Independent Auditors and the Company's management the results of the Independent Auditors' review of the quarterly financial statements and resolve any issue that may arise;

- discuss significant issues, events and transactions and any significant changes regarding accounting principles, practices, policies (internal or external), judgments or estimates with the Company's management and the Independent Auditors; and

- discuss and assist in resolving any disagreements between the Company's management and the Independent Auditors regarding financial reporting.

**<u>Internal Controls</u>**

6. Periodically discuss with the Company's principal accounting officer the function of the Company's disclosure controls and procedures and any disclosure committee that may be established by the Company. Discuss with the Company's Chief Executive Officer and Chief Financial Officer their conclusions regarding the effectiveness of the Company's disclosure controls and procedures.

7. Review and discuss with the Independent Auditors and the Company's management their periodic reviews of the adequacy of the Company's accounting and financial reporting processes and systems of internal control, including any significant deficiencies and material weaknesses in their design or operation. In doing so, the Committee shall evaluate the Company's compliance with Section 404 of the Sarbanes-Oxley Act of 2002, including risk management required thereby.

8. Review any fraud involving management or any employee of the Company with a significant role in the Company's internal controls over financial reporting that are disclosed to the Committee.

9. Discuss any comments or recommendations of the Independent Auditors outlined in their annual management letter or internal control reports.

10. Periodically consult with the Independent Auditors out of the presence of the Company's management about internal controls, the fullness and accuracy of the

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Company's financial statements and any other matters that the Committee or Independent Auditors believe should be discussed privately with the Committee.

11. Meet separately, periodically, with management and with internal auditors (or other personnel responsible for the internal audit function).

12. ***Review with management the Company's major financial risk exposures and the steps management has taken to monitor such exposures, including the Company's procedures and any related policies, with respect to risk assessment and risk management***.

13. Establish procedures for (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and violations of the Company's Code of Business Conduct and Ethics or other legal policies or applicable law; and (ii) the confidential, anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters or violations of Company policies or applicable laws (the "**Whistleblower Policy**"), and any changes therein. Oversee the review of any such complaints and submissions that have been received, including the current status and the resolution if one has been reached.

*   *   *

**<u>Independent Auditors</u>**

*   *   *

18. Review and discuss with the Independent Auditors the reports delivered to the Committee by the Independent Auditors regarding:

- critical accounting policies, estimates and practices used;

- alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, the ramifications of the alternatives, and the treatment preferred by the Independent Auditors; and

- other material written communications between the Independent Auditors and the Company's management, such as any management letter or schedule of unadjusted differences.

**<u>General</u>**

19. On a regular basis, review the status of any legal and regulatory matters that could have a significant impact on the Company's financial statements.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**Breaches of Duties**

40.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Amyris, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

41.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to engage in making improper statements to the public and Amyris stockholders and thus causing the Company to incur substantial damage.

42.     The Audit Committee members had a duty to review the Company's earnings press releases and regulatory filings.  The Audit Committee Defendants breached their duty of loyalty and good faith by approving the improper statements detailed herein and by failing to properly oversee Amyris's public statements and internal control function.

43.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Amyris, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Amyris has expended, and will continue to expend, significant sums of money.

44.     The Individual Defendants also breached their own Code.  The Company's Code demands that "documents filed with or submitted to the [SEC] and other public disclosures are full, fair, and accurate," but the Individual Defendants violated this provision by allowing and disseminating misleading financial reports to the SEC and the public.

45.     The Insider Selling Defendants breached their duty of loyalty by selling shares of Amyris stock on material, nonpublic information.  These unlawful sales damaged the Company.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

46.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct

herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

47.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Amyris, regarding the Individual Defendants' management of Amyris's operations and the Company's revenues; (ii) facilitate defendants Doerr, Kung, and Melo's illicit sale of over $54.92 million of their personally held shares while in possession of material, nonpublic information; and (iii) enhance the Individual Defendants' executive and directorial positions at Amyris and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

48.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

49.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violation of securities law, breach of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

50.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

51.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or

her overall contribution to and furtherance of the wrongdoing.

**OVERVIEW**

52.     Amyris is an industrial biotechnology company that develops and produces sustainable ingredients for the Health & Wellness, Clean Beauty, and Flavors & Fragrances markets.  The Company uses its proprietary technology platform to engineer and produce organisms.  Amyris combines these organisms with sugarcane in a fermentation process to create large volume, high-value molecules for specialty ingredients.  Amyris claims that its biotechnology platform and fermentation process is a more sustainable and economic alternative to existing manufacturing processes.  Further, the Company believes that "industrial synthetic biology represents a third industrial revolution, bringing together biology and engineering to generate new, more sustainable materials to meet the growing global demand for bio-based replacements for petroleum-based and traditional animal- or plant-derived ingredients."

53.     In 2014, the Company successfully commercialized its brand of renewable farnesene, a hydrocarbon molecule that the Company manufactures through fermentation using its engineered microbes.  Farnesene is Amyris's first revenue-generating molecule, the derivatives of which are sold in hundreds of products as solvents, fragrances, skincare products, polymers, and lubricant ingredients.  To produce farnesene and future molecules, Amyris built a production facility in Brazil known as "Brotas 1."

54.     In 2016, the Company entered into a farnesene supply agreement with Nenter & Co., Inc. ("Nenter") (the "Nenter Supply Agreement").  Under the Nenter Supply Agreement, Nenter is required to purchase minimum farnesene quantities and make royalty payments to the Company representing a portion of Nenter's profit on the sale of products produced using Amyris's farnesene.  Nenter has been one of Amyris's largest customers, representing approximately 10% of Amyris's revenue in 2017.

55.     On December 28, 2017, the Company sold Brotas 1 and Amyris Brasil, the subsidiary operating the facility, to a Dutch company called Koninklijke DMS N.V. ("DSM") for $57 million.  In connection with the sale, DSM and Amyris entered into a license agreement and royalty agreement.  The Company licensed the use of farnesene in the Vitamin E, lubricant, and flavor and fragrance markets to DSM for a nonrefundable fee of $27.5 million.  In addition, the Company assigned the Nenter Supply Agreement to DSM.  Pursuant to this assignment agreement, DSM agreed to pay Amyris a portion of the

profits realized by Nenter and paid to DSM.  At closing, DSM paid Amyris a nonrefundable royalty payment of $15 million, and further agreed to minimum royalties totaling $33 million for 2018, 2019, and 2020, the first three years of the renewable agreement.

56.     In accounting for license and royalty payments, Amyris took advantage of a new rule issued by the Financial Accounting Standards Board that took effect on January 1, 2018.  The new rule, Accounting Standard Codification ("ASC") Topic 606 ("ASC 606"), *Revenue From Contracts with Customers*, provides guidance on how and when to recognize revenue from customers.  Generally, ASC 606 permits businesses to recognize revenue once they have fulfilled all of their performance obligations, rather than upon receipt of payment.  For instance, a business may recognize revenue when it delivers a good, provided delivery is its final performance obligation.  In this example, revenue is certain because money exchanges hands at a fixed price for a product.  Amyris's application of ASC 606 to future royalty payments due from Nenter via DSM, however, is more complicated than this simple example.

57.     As described above, Amyris licenses farnesene to DSM, who then supplies the ingredient to Nenter.  Nenter then uses the farnesene to produce Vitamin E products to sell to consumers.  Amyris and DSM share royalties on Nenter's profits from these product sales.  However, rather than record royalty revenue when Nenter sells Vitamin E products and actually makes a profit, Amyris instead recognizes revenue when DSM sells farnesene to Nenter.  Since the amount the Company actually receives is dependent on Nenter's profit at a later date, it is impossible for Amyris to know the amount of royalties due when the Company records them as revenue.  In an effort to circumvent this uncertainty, the Individual Defendants claim that Amyris applies complex, probability-based variables to estimate the royalty revenue.  The Individual Defendants' estimations, however, grossly overstated the royalty revenue due from DSM.

58.     Amyris began using ASC 606 immediately after the rule became effective in 2018.  Initially, the Individual Defendants' application of ASC 606 to Amyris's royalty revenue gave the Company an appearance of growth.  In particular, in the first quarter of 2018, the Company reported license and royalty revenue of $11.43 million, nearly half the Company's total revenue of $22.99 million, which represented a 77% growth from the previous year's first quarter.  The Individual

Defendants either knew or recklessly ignored that the reported growth resulted from overestimating future royalty payments.  Nevertheless, these fiduciaries claimed the growth was sustainable and strongly indicated the performance of the Company's products.  In addition, the Individual Defendants claimed that a "very strong year" was ahead, with expected revenue of between $185 million and $195 million for 2018.  Defendant Melo further claimed investors could expect between $50 million and $60 million of license and royalty revenue for the year.

59.     By the end of the second quarter, Amyris had reported total revenue of $46.19 million and license and royalty revenue of $18.32 million for the six months ended June 30, 2018.  However without ASC 606, Amyris would have only been able to report $2.6 million in license and royalty revenue, the amount that it had actually received from DSM by the end of the second quarter.  Even though Amyris was not receiving substantial royalty payments from DSM via Nenter, and even though they had no way to accurately predict these future payments, the Individual Defendants claimed that royalty revenues would increase over the second half of the year and into the following year.

60.     The inevitable consequences of grossly overestimating royalty revenue caught up with the Individual Defendants during the second half of 2018.  For the third quarter, Amyris reported total revenue of $14.86 million and license and royalty revenue of only $142,000.  Amyris's weak third quarter results disappointed its investors, who were led to expect a strong year from Amyris with increased revenue, particularly license and royalty revenue.  Despite the near impossibility of Amyris meeting the Individual Defendants' stated expectations for the 2018, defendant Melo assured investors the shortfall would be "made up" through year end.

61.     The Company's fourth quarter results, however, only brought further disappointment to its investors.  On March 18, 2019, Amyris issued a press release announcing fourth quarter revenue of $19.4 million and license and royalty revenue of $1.2 million.  The press release further disclosed fiscal 2018 revenue of just $80.4 million, missing the revenue guidance for the year by 58%.

62.     A day later, on March 19, 2019, the Company announced that it would be unable to timely file its Annual Report for 2018 due to "the significant time and resources that were devoted to the accounting for and disclosure of the significant transactions with [DSM]."  Then, on April 11, 2019, Amyris announced that it was restating its fiscal 2018 results to reduce revenue by at least $12 million

and increase net loss by at least $7 million, explaining that "a material error was made related to the estimates for recognizing revenue for royalty payments."

63.    Later, on May 16, 2019, the Company announced additional restatements required for fiscal year 2017, which also resulted from material accounting errors.  In particular, Amyris revealed the Individual Defendants failed to record between $17 million and $19 million as either a liability or charged to the Company's consolidated statement of operations.  These material errors were unearthed as Amyris prepared its untimely Annual Report for 2018.

64.    As of June 20, 2019, the Individual Defendants have yet to file the Company's Annual Report for 2018.

**IMPROPER STATEMENTS**

65.    As detailed below, between March 15, 2018 and March 19, 2019, the Individual Defendants repeatedly boasted about the Company's financial prospects and growth while also emphasizing expectations of increased royalty revenue.  These fiduciaries also routinely claimed full disclosure of any material weaknesses or changes in the Company's internal controls.  As would later be revealed, these statements were woefully inaccurate.  In truth, Amyris operated with an undisclosed material weakness in financial controls and grossly overestimated reported royalty revenue throughout this time.  These accounting violations led to improperly recognized revenue, which, in turn, resulted in the Company paying undeserved bonuses.

66.    On March 15, 2018, Amyris issued a press release titled, "Amyris Reports Another Strong Quarter with Solid Operating Performance and 2017 Revenue of $143.3 Million up 113% over 2016."  In the press release, Amyris reported fiscal year 2017 revenue of $143.4 million, compared to $67.2 million for 2016.  The Company also announced revenue of $80.6 million for the fourth quarter of 2017.  Amyris explained these results were "primarily due to the DMS transaction," which contributed $57 million.

67.    In the press release, the Individual Defendants led investors to believe that Amyris would grow and deliver positive results in 2018.  The press release stated that the Company expects revenue "of approximately $185-$195 million … for 2018."  Defendant Melo commented on these results in the press release, further leading investors to expect "another very strong year."  In particular, defendant

Melo stated:

> We've completed another record year and a very strong fourth quarter. We've exceeded our key targets for 2017 and have started 2018 with continued strong growth in revenues and operating performance…. We have completed the transformation of our company into one of the leading global companies focused on making our planet healthier. We have organized around three core markets – Performance Health and Wellness, Clean Skin-Care and Pure Flavor & Fragrance Ingredients.  Each of these markets is delivering strong, profitable growth underpinned by the most advantaged technology in the sector. We are making good for humanity and our planet with No Compromise® products.  We are very pleased with our performance and *expect another very strong year* delivering continued market disruption with our partners.

68.     On the same day, Amyris held a conference call with analysts and investors to discuss the results disclosed in the press release.  During the call, defendant Melo characterized the DSM transaction as strategic and transformative.  Defendant Melo stated:

> In 2017, we've also successfully evolved our business to profitable growth through a series of strategic transactions with DSM. The fourth quarter was the completion of this transformation of Amyris. Our fourth quarter results are a good indication of what you can expect from us going forward.

69.     Although Amyris recorded royalty revenues based on uncertain estimates of future payments, during the call, defendant Melo portrayed these revenues as amounts already provided to Amyris, stating that royalty revenue "represents the revenue we receive."  Even though royalty revenues would reflect the Individual Defendants' overestimations, defendant Melo instead claimed that they indicated the success of Amyris's products.  In particular, defendant Melo stated:

> In addition to making our core markets clear to you, we are also simplifying how we talk about our business model and how we report our results.  We've been explaining the value share part of our business model to you and have been blending this into our product revenue line.  This has become very material faster than we expected, and we will now be reported -- reporting separately and labeling these as license and royalties. When you see this line in our [Generally Accepted Accounting Principles ("GAAP")] results, this is mostly value share and *represents the revenue we receive from partners as our share of the value we create when our customers and partners use our product in their formulations. This is a good indicator of the level of disruption our technology is enabling*.

> License and royalties for 2017 were $64.5 million compared with $15.8 million for the prior period. As we've indicated before, we consider our product gross margin as the combination of direct margin gained when we ship the product and then the future

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

payments received that represent our share of value from the sale of the final product with our ingredient. For the fourth quarter, we also included the license payment we received from DSM in the licenses and royalty line of our financials due to the accounting treatment applied to the sale of the asset and nature of the transaction.

With [historical] classification of the revenue, we would have expected to exceed $60 million in collaboration payments for 2017. This is above our guidance range of $50 million to $60 million of annual collaboration payments. On the value share component, we would have expected to exceed $30 million of value share in 2017, which compares to about $6 million of guidance we had provided in the past.

So to summarize. Going forward, when you see royalties and licenses, this is where we will report our value share payments. Product revenue will not include value share. This will keep the product revenue and product direct cost of goods clean and near breakeven and the gross margin from products or what we see as our value share reported as a royalty. ***Think of royalties as 100% gross margin***. Think of products having the fully loaded cost of goods for those products.

\* \* \*

***We are expecting continuous strong growth through 2022 and beyond***, and have this well underpinned by customer agreements in each of our core markets.

70. On April 2, 2018, the Company filed a Notification of Late Filing with the SEC on Form 12b-25, announcing that it was unable to timely file its Annual Report for 2017. Amyris explained its tardiness was due to both the "significant time and resources that were devoted to the accounting for and disclosure of [the DSM transaction]" as well as assessing the impact of ASC 606 on its disclosures. The Company also announced that the material weakness in its internal control over financial reporting, which the Company had previously disclosed on November 20, 2017, "remains unremediated." In particular, the Company's Notification of Late Filing stated:

Amyris, Inc. (the "Company") was unable to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2017 (the "Form 10-K") within the prescribed time period without unreasonable effort and expense because of the significant time and resources that were devoted to the accounting for and disclosure of the significant transaction with Koninklijke DSM N.V. that closed on December 28, 2017. The Company is also continuing to assess, compile and obtain information relating to its cash flows for the coming year and is finalizing related analyses and disclosures in the Form 10-K and is completing its evaluation of the impact of the adoption of ASC 606, *Revenue from Contracts with Customers*, in 2018 and related disclosure. These activities delayed the completion of the Form 10-K.

As previously reported in the Company's Quarterly Report on Form 10-Q for the fiscal quarter ended September 30, 2017, the Company identified a material weakness in internal control over financial reporting related to a lack of sufficient resources in its financial reporting function to be able to adequately identify, record and disclose non-routine transactions which remains unremediated at December 31, 2017. The Company is in the process of completing its evaluation of internal control over financial reporting.

71.    On April 17, 2018, the Company belatedly filed its Annual Report on Form 10-K for the year ended December 31, 2017 (the "2017 Form 10-K") with the SEC.  Defendants Melo, Valiasek, Duyk, Doerr, Piwnica, Al Thani, Williams, Yang, Vuillez, Eykerman, Goppelsroeder, Kung, and Reinach signed the 2017 Form 10-K.  The 2017 Form 10-K reiterates substantially the same results announced in the March 15, 2018 press release, discussed above.  Additionally, the 2017 Form 10-K discloses DSM's contribution of $57.97 million in license and royalty revenue.  The 2017 Form 10-K also reveals that Nenter was the Company's third-largest customer, contributing $2.6 million in license and royalty revenue.

72.    The 2017 Form 10-K reported total liabilities of $346.1 million and net loss attributable to the Company's common stockholders of $93.3 million.  In addition, the 2017 Form 10-K reported the Company's liabilities and debt resulting from contractual and creditor agreements.  Of those included Amyris's payment obligations to Ginkgo Bioworks, Inc. ("Ginkgo").  The 2017 Form 10-K reported net debt from Ginkgo notes of $7.01 million.

73.    In addition, the 2017 Form 10-K disclosed that management identified several material weaknesses that resulted in material misstatements.  The 2017 Form 10-K stated:

Management, under the supervision of our CEO and CFO, and oversight of the Board of Directors, conducted an assessment of the effectiveness of our internal control over financial reporting as of December 31, 2017, based on the criteria set forth in Internal Control–Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework). Based on this assessment, management has identified the material weakness described below:

- The Company's control environment was not effective because the Company lacked a sufficient number of trained resources with assigned responsibility and accountability over the design and operation of internal controls related to complex, significant non-routine transactions as well as routine transactions and financial statement presentation and disclosure;
- The Company did not have an effective risk assessment process to identify and analyze necessary changes in significant accounting policies and practices that

were responsive to: (i) changes in business operations resulting from complex significant non-routine transactions, (ii) implementation of new accounting standards and related disclosures, and (iii) completeness and adequacy of required disclosures; and

- The Company did not have an effective information and communication process to ensure that the processes and controls were effectively documented and disseminated to enable financial personnel to effectively carry out their roles and responsibilities.

As a consequence, the Company did not have effective process level control activities over the following:

- The Company did not adequately design and document controls over complex, significant non-routine transactions that included various financing arrangements and a business divestiture, all which involved multiple components including revenue elements; and
- The Company's controls over account reconciliations, review and approval of manual journal entries, and timely and complete financial statement presentation and disclosure did not operate effectively

The material weakness described above resulted in material misstatements in the gain or loss on extinguishment, gain or loss from change in fair value of derivative liabilities, derivative liabilities, collaboration revenue, and additional paid-in capital in the preliminary consolidated financial statements that were corrected prior to the issuance of the consolidated financial statements as of and for the year ended December 31, 2017. However, the material weakness creates a reasonable possibility that a material misstatement of our annual or interim consolidated financial statements that would not be prevented or detected on a timely basis. Therefore, we concluded that our internal control over financial reporting is not effective as of December 31, 2017.

74. However, the Individual Defendants claimed that Amyris expects to resolve these material weaknesses through certain actions described in a "remediation plan." Thus, the 2017 Form 10-K left the impression that Amyris's future disclosures will be cured from internal control failures and any resulting misstatements. The 2017 Form 10-K stated:

**Remediation Plan**

We are addressing the identified material weakness by taking the following actions:

- Augmenting our accounting staff with additional personnel, as well as evaluating our personnel in key accounting positions;
- Documenting and augmenting key policies and internal control procedures to strengthen our identification of and accounting for complex, significant non-routine transactions and routine transactions; and
- Implementing a program for training of internal staff members covering: (i) the Company's accounting policies and procedures, (ii) roles and responsibilities of

- 27 -
VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

the Company's finance department, and (iii) new and existing financial accounting issues.

Management believes that the foregoing efforts will effectively remediate the material weakness. As we continue to evaluate and work to improve our internal control over financial reporting, management may determine to take additional measures to address control deficiencies or determine to modify the remediation plan described above.

75.     The 2017 Form 10-K contained defendants Melo's and Valiasek's signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of the report.  The certifications of defendants Melo and Valiasek acknowledged their responsibility "establishing and maintaining disclosure controls and procedures … and internal control over financial reporting … for [Amyris]" and incorrectly stated that they have:

a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

76.     Defendants Melo and Valiasek also incorrectly certified that they had disclosed any deficiencies and material weaknesses in the Company's internal controls, including:

a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

77.   On May 14, 2018, Amyris issued a press release titled, "Amyris Continues Strong Momentum and Execution with 77% Revenue Growth and Exceeds Gross Margin Target."  In the press release, Amyris reported revenue of $23 million for the first quarter of 2018, compared with $13 million in the first quarter of 2017.  The Company further announced over $11 million in royalty payments for the first quarter of 2018, explaining, "[o]ur product related royalty revenue (previously referred to as value share) delivered $11.4 million of 100% gross margin related revenue."

78.   On the same day, the Company held an earnings conference call with analysts and investors to discuss the results in the press release.  During the call, defendant Melo claimed increased royalty revenues indicated the performance of Amyris's products, suggesting that the Company was actually receiving royalty profits from product sales rather than overestimating future amounts due from DSM.  In particular, defendant Melo stated:

> Our royalty payments, which we used to call value share from products delivered was $11.4 million in the first quarter versus $225,000 for the same period last year. ***This is a strong indication of the underlying performance of our products in their respective end markets and the sustainability of our differentiated and advantaged business model***.

79.   During the question and answer session of the call, an analyst asked whether the $11.4 million of royalty revenue would be steady throughout the year.  In response, defendant Melo falsely assured the analyst could expect $50-$60 million in royalty revenue for the year, despite "some choppiness."  The transcript of their conversation is provided as follows:

> **Amit Dayal** – *H.C. Wainwright & Co, LLC, Research Division – MD of Equity Research & Senior Technology Analyst*
>
> One of my questions is around the royalty and licenses side.  Is the $11.4 million, all of it royalties for the quarter? Or are there any license fees in it, too?
>
> **[Defendant Melo]**
>
> Amit, first of all, thank you for being on the call and thank you for the question.  Just about all of it is royalty or what we used to call value share.  So there is no license revenue in the quarter.

- 29 -

**[Amit Dayal]**

Understood.  And how should we sort of look into these royalty revenues going forward?  Will this kind of be steady state at this type of level or will there be some variances depending on the end-market sales?

**[Defendant Melo]**

Yes. I mean, the way I would look at it, I think what we said in the last call is that we would generate around ***$50 million to $60 million*** of value share for the year, and that is the royalty line. ***And that's what you should expect***. It won't be perfectly linear for the year, so you'll see some choppiness.  But again, for the full year, $50 million to $60 million, I'd expect some choppiness, but full year strong flows. No change.

80.    On May 16, 2018, Amyris filed another Notification of Late Filing on Form 12b-25 with the SEC announcing the Company was unable to file its Quarterly Report for the first quarter of 2018 within the prescribed time period.  The Company explained this was "because of the significant time and resources that were devoted to the accounting for a disclosure of the adoption of ASC 606…."  Amyris further reported the Company was engaged in ongoing remediation efforts to resolve its previously disclosed material weaknesses in internal controls, including the hiring of experienced personnel.

81.    On May 18, 2018, the Company filed its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2018 ("the Q1 2018 Form 10-Q") with the SEC.  The Q1 2018 Form 10-Q reported total revenue of $22.99 million and license and royalty revenue of $11.4 million.

82.    In addition, the Q1 2018 Form 10-Q stated that the Company's material weaknesses in internal control over financial reporting previously disclosed in the 2017 Form 10-K have not yet been remediated.  The Q1 2018 Form 10-Q stated, "Otherwise, there were no changes in our internal control over financial reporting during the fiscal quarter ended March 31, 2018 that have materially affected, or are reasonably likely to materially effect, our internal control over financial reporting."  The Q1 2018 Form 10-Q contained defendants Melo's and Valiasek's signed certifications pursuant to SOX attesting to the accuracy of the report and the disclosure of any weakness or change in the Company's internal controls.  These certifications pursuant to SOX are the same or substantially similar to those in the 2017 Form 10-K, referenced in ¶¶75-76, above.

83.    On May 22, 2018, the Company hosted a presentation called "Amyris, Inc. BioDisrupt 2018," which led the public to anticipate continued revenue growth.  During the presentation, defendant

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Valiasek touted Amyris's results for the first quarter of 2018, claiming further that Amyris's revenue growth was "sustainable" and "year over year amazing."  In addition, defendant Valiasek reiterated the Company's expected revenue of between $185 million and $195 million for 2018 and stated that investors would "see the same thing in 2019."  Specifically, defendant Valiasek stated:

> So again, what are seeing? *Sustainable growth*. This is how we get to [earnings before interest, taxes, depreciation, and amortization ("EBITDA")] positive in 2018 and the outer years, Okay. 83% non-GAAP gross margin versus last year same quarter, negative 4%.
>
> And if we look at the adjusted EBITDA for the quarter versus last year, 26% improvement. One of the important pieces that I wanted to note today is last year versus this year, we had a lot of one-time cost in 2018 first quarter, some of which are related to ASC 606, some of which are related to the closing of our transaction in Q4 2018, which closed on December 28th. And so a lot of the costs that we incurred rolls over into Q1 2018. And we also some product development cost which also contributed to that $6 million in one-time cost.
>
> But if you take out of our run rate from Q1 2018, that $6 million where it's almost at the exact same run rate we were at for Q4 2017. So a lot of investors and analysts are saying to me, Okay, well the information that you're giving me, we're doing the math, we've said our EBITDA will be $10 million positive. If we do the math, you're going to be even more than that. But what we wanted to do consistently is be conservative, make sure that we meet our numbers.
>
> Here's our revenue growth. It's again, year over year amazing. *We're expecting to do 185 to 195 in 2018*. Again, gross margin at least 70% for 2018. And you'll see the same thing in 2019.

84.     Also during the presentation, defendant Melo declared Amyris's royalty revenue would significantly increase during the second half of 2018 and continue to increase thereafter.  In supporting his claim of continued royalty revenue increases, defendant Melo ignored the inherent uncertainty of estimating royalty revenue and instead stated, "[t]he math is pretty simple."  In particular, defendant Melo stated:

> The next segment is health and wellness. And health and wellness has three specific drivers of growth that are all contracted and all part of our business today. The first is DSM has a value share/royalty agreement with us for our current vitamin, and also for the vitamin we plan on introducing.

What I don't think we've made very clear is that the rate, ***the percentage of that royalty increases significantly over the second half of this year and into next year and the year after***.

***The math is pretty simple***. We started the first half of this year with about a 25% value share. We end the year at a 35% value share. And we go into next year and the following year with a 45% value share.

Without much change to our base business, the share we get of the margin in Vitamin E or the ***royalty payment is significantly greater going into the second half and going into 2019 and 2020***.

85.     On August 6, 2018, Amyris issued a press release titled, "Amyris Delivers Another Quarter of Profitable Growth While Executing Well on Strategic Agenda." The press release disclosed total revenue of $24.8 million for the second quarter of 2018. Defendant Melo commented on the second quarter's positive results, stating they are a "demonstration that our focus on profitable growth is yielding results."

86.     On the same day, the Company held a conference call with analysts and investors to discuss the Company's second quarter results. During the call, defendants perpetuated expectations of strong financial results for the remaining half of 2018. In his opening statement, defendant Melo falsely attributed Amyris's revenue growth to "strong demand." Defendant Melo also claimed royalty revenue was "continuing to do well," even though Amyris had received only $2.6 million from DSM by the end of the second quarter, the amount the Company would have reported without ASC 606. In particular, defendant Melo stated:

Let me start with our business performance. We delivered 8% revenue growth over the first quarter of 2018 and 15% growth over the second quarter of 2017 when you adjust for the Vitamin E product sales that are now produced and supplied by DSM, no longer supplied or in the Amyris portfolio.

***Our first half of 2018 revenue is 48% better than the first half of 2017 when adjusting our Vitamin E contract sold to DSM***. This like-for-like improvement is a great example of the ***strong demand*** we are experiencing within our core product portfolio and a great testament to the strength of our strategy of focusing on the health and beauty markets and the simplification of our business model and product portfolio.

In addition to the strong top line performance, our gross margins and adjusted EBITDA are also much improved over 2017. Our adjusted EBITDA is $4.7 million better in the second quarter of 2018 versus 2017, and our first half 2018 is $9.7 million better.

Our gross profit has also improved significantly from the first half of 2017. First half of 2017, we had 19% non-GAAP gross margin. In the first half of 2018, we are at 84% non-GAAP gross margin, the second quarter also at the 84% gross margin level.

We delivered most of this first half performance on the back of our Clean Beauty business, the value share/royalty payments and collaborations. Most of our ingredient shipments, all of our sweetener revenue and our new collaborations are expected in the second half of 2018. This is consistent with our business model of producing the ingredients we sell in single annual batches, and the phasing of our new collaboration agreements are also consistent with last year, predominantly in the second half of the year. All of the expected revenue for this year is either contracted or in the final contract phase.

**Our royalty/value share is continuing to do well**, and our Clean Beauty business is growing faster than we expected.

87.     Also during the call, defendant Melo changed course from his previous claim that investors could expect royalty revenue of between $50 million and $60 million in 2018, stating that only $10 million to $15 million of royalty revenues were expected for the second half of the year.  During the call, he conceded that Amyris's royalty revenue depended upon the Vitamin E market's volatility and Nenter's sales.  However, rather than reduce the Company's estimated 2018 revenue, defendant Melo instead stated that Amyris expected ambitious revenue of at least $135 million for the second half of 2018.  Despite the admitted volatility of the Vitamin E market, defendant Melo assured investors that the Individual Defendants "have been very effective at predicting market prices to date."  Defendant Melo stated:

The only area of our business that we have no control over is our Vitamin E royalty. In this activity, DSM is now responsible for the supply, and we are purely a receiver of value share or royalty based on market price and of volumes sold by Nenter. **This is a very volatile market, and we have no control over the price Nenter sells into this market. These royalties represent between $10 million and $15 million of expected second half performance, and that is built within the $135 million to $145 million of expected second half revenue. We have been very effective at predicting market prices to date**….

88.     On August 14, 2018, the Company filed its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2018 (the Q2 2018 Form 10-Q") with the SEC.  In the Q2 2018 Form 10-Q, Amyris lowered its previously disclosed second quarter revenue of $24.8 million to $23.19 million.

The Q2 2018 Form 10-Q further announced license and royalty revenue of $6.88 million for the second quarter.

89.    In addition, the Q2 2018 Form 10-Q stated that the Company's material weaknesses in internal control over financial reporting previously disclosed in the 2017 Form 10-K have not yet been remediated.  The Q2 2018 Form 10-Q stated, "Otherwise, there were no changes in our internal control over financial reporting during the fiscal quarter ended June 30, 2018 that have materially affected, or are reasonably likely to materially effect, our internal control over financial reporting." The Q2 2018 Form 10-Q contained defendants Melo's and Valiasek's signed certifications pursuant to SOX attesting to the accuracy of the report and the disclosure of any weakness or change in the Company's internal controls.  These certifications pursuant to SOX are the same or substantially similar to those in the 2017 Form 10-K, referenced in ¶¶75-76, above.

## REASONS THE STATEMENTS WERE IMPROPER

90.    The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)    that the Individual Defendants were misusing ASC 606 and were unable estimate royalty revenue on certain transactions;

(b)    that the reported licensing and royalty revenues were overestimated;

(c)    that Amyris would need to restate financial statements;

(d)    that there was an undisclosed material weakness in Amyris's internal controls; and

(e)    as a result of the foregoing, the Company's representations concerning its financial results, business prospects, and internal controls were improper.

## THE INDIVIDUAL DEFENDANTS NEGLIGENTLY MADE MISLEADING STATEMENTS IN THE COMPANY'S 2018 PROXY

91.    Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of these defendants, and they do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud,

scienter, or recklessness with regard to these allegations and related claims.

92.     On April 27, 2018, the Company issued its 2018 Proxy for the 2018 Annual Meeting of Stockholders, which was held on May 22, 2018.  In the 2018 Proxy, defendants Melo, Duyk, Doerr, Piwnica, Williams, Yang, Eykerman, Goppelsroeder, Kung, Al Thani, Vuillez, and Reinach solicited stockholder votes to, among other things: (i) reelect defendants Melo, Eykerman, Kung, and Williams to the Board; and (ii) approve the issuance of the CEO Equity Awards.

**Misleading Proposal to Reelect Defendants Melo, Eykerman, Kung, and Williams to the Board**

93.     In support of defendants Melo, Duyk, Doerr, Piwnica, Williams, Yang, Eykerman, Goppelsroeder, Kung, Al Thani, Vuillez, and Reinach's bid to reelect defendants Melo, Eykerman, Kung, and Williams to the Board, these defendants highlighted their supposed oversight of the Company.   In particular, the 2018 Proxy assured stockholders that the Board and its committees regularly assess and manage the risks that Amyris faces, including legal and regulatory risks, financial controls, and risks associated with compensation programs and plans.  The 2018 Proxy stated:

**Role of the Board in Risk Oversight**

We consider risk as part of our regular evaluation of business strategy and decisions. Assessing and managing risk is the responsibility of our management, which establishes and maintains risk management processes, including prioritization processes, action plans and mitigation measures, designed to balance the risk and benefit of opportunities and strategies. It is management's responsibility to anticipate, identify and communicate risks to the Board and/or its committees. The Board as a whole oversees our risk management systems and processes, as implemented by management and the Board's committees. As part of its oversight role, the Board has established an enterprise risk management process that involves management discussions with and updates to members of the Audit Committee regarding enterprise risk prioritization and mitigation. In addition, the Board uses its committees to assist in its risk oversight function as follows:

- The Audit Committee has responsibility for overseeing our financial controls and risk and legal and regulatory matters.

- The Leadership Development and Compensation Committee is responsible for oversight of risk associated with our compensation programs and plans.

- The Nominating and Governance Committee is responsible for oversight of Board processes and corporate governance related risks.

The Board receives regular reports from committee Chairs regarding the committees' activities. In addition, discussions with the Board regarding our strategic plans and

objectives, business results, financial condition, compensation programs, strategic transactions, and other business discussed with the Board include discussions of the risks associated with the particular item under consideration.

94.   The 2018 Proxy thus assured stockholders that the Board was involved with Amyris's business strategy and actively monitored the Company's risks and exposures.  In reality, the Board was utterly failing in its oversight duties by allowing the Company to operate with inadequate internal controls.   In addition, contrary to its claimed oversight over risks associated with compensation programs and plans, the Board promoted lucrative executive compensation packages that incentivized and resulted in fabricated financial results.

95.   The 2018 Proxy harmed Amyris by interfering with the proper governance on its behalf that follows the free and informed exercise of stockholders' right to vote for directors.  As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to reelect defendants Melo, Eykerman, Kung, and Williams to the Board.

**Misleading Proposal to Approve the Issuance of the CEO Equity Awards**

96.   In addition to soliciting defendant Melo's reelection to the Board in the 2018 Proxy, defendants also recommended that Amyris stockholders approve the issuance of equity awards to the Company's sole employee director, defendant Melo.  The CEO Equity Awards proposal, if approved, would result in the Company providing to defendant Melo: (i) a stock option to purchase 3,250,000 shares of Amyris common stock; and (ii) a restricted stock unit award for 700,000 shares of Amyris common stock.  As of March 31, 2018, the 2018 Proxy stated, defendant Melo beneficially owned 6,840 shares of Amyris common stock, 76,332 unvested restricted stock units, and options exercisable within sixty days of March 31, 2018 to purchase 138,439 shares of common stock.  According to the 2018 Proxy, these shares and options represented "less than 1% of [the Company's] outstanding common stock as of such date."

97.   In support of the bid to approve the CEO Equity Awards, defendants Melo, Duyk, Doerr, Piwnica, Williams, Yang, Eykerman, Goppelsroeder, Kung, Al Thani, Vuillez, and Reinach assured the Company's investors that the awards align defendant Melo's interests with those of Amyris's stockholders and "reduce the possibility of business decisions that favor short-term results at the expense of long-term value creation."  In addition, these defendants assured the awards promoted defendant

Melo's focus on the Company's sustainable growth and long-term stockholder returns.  In particular, the 2018 Proxy stated:

**Proposal 5 —**
**Approval of CEO Equity Awards**

**General**

The Board is asking Amyris's stockholders to approve the following equity awards for our President and Chief Executive Officer, John Melo: (i) a stock option to purchase 3,250,000 shares of our common stock, such award being subject to performance-based vesting conditions as described herein (the "CEO Performance Option"), and (ii) a restricted stock unit award for 700,000 shares of our common stock in accordance with the terms described herein (the "CEO RSU" and together with the CEO Performance Option, the "CEO Equity Awards").

The Board's primary objective in designing the CEO Equity Awards is to help Amyris grow and achieve its mission, which would facilitate the creation of significant stockholder value. There are three main reasons why the Board recommends that stockholders approve the CEO Equity Awards:

- The CEO Equity Awards *strengthen Mr. Melo's incentives and further align his interests with our long-term strategic direction and the interests of our stockholders and reduce the possibility of business decisions that favor short-term results at the expense of long-term value creation*;

- The incentives created by the CEO Equity Awards will further ensure Mr. Melo's continued leadership of Amyris over the long-term; and

- The performance and stock price conditions for vesting of the CEO Performance Option *will promote Mr. Melo's continued focus on Amyris's growth, sustainability and profitability to drive sustained, long-term stockholder returns*.

98.     Thus, the 2018 Proxy assured stockholders that defendant Melo's interests were aligned with the Company's long-term strategic direction as well as tied to the stockholders.  The 2018 Proxy claimed the CEO Equity Awards would reinforce, or "further" his already existing alignment with these interests.  In truth, however, defendant Melo's personal interest to make short-term business decisions aimed at achieving performance targets tied to lucrative bonus awards had eroded his ties with the Company's stockholders and long-term strategic direction.

99.     In particular, under the Company's bonus plan (the "Bonus Plan"), defendant Melo may receive over 100% of his annual salary based on Amyris's achievement of established performance metrics.  The most significant performance metric under the Bonus Plan for 2017 was the Company's

achievement of GAAP revenue, which was weighted 40%.  Based substantially on the Company's GAAP revenue in 2017, defendant Melo received a bonus of $581,948, over 105% of his annual bonus target of $554,166.[2]  Under the Bonus Plan for 2018, the weight of the Company's GAAP revenue for purposes of determining bonuses increased from 40% to 50%.  This increase further incentivized defendant Melo to inflate the Company's reported GAAP revenue in the short-term at the expense of long-term value creation.

100.     Thus, the CEO Equity Awards neither reduce short-term incentives nor reinforce the link between defendant Melo's interests and the Company's stockholders, as the 2018 Proxy claimed.  Rather, the awards merely granted defendant Melo an additional 700,000 restricted stock units on top of his already exorbitant compensation.

101.     The 2018 Proxy harmed Amyris by overcompensating its CEO and director.  As a result of the misleading statements in the 2018 Proxy, the Company's stockholders voted via an uninformed stockholder vote to approve the CEO Equity Awards.  Now, 700,000 stock units of Amyris, or 1.4% of the total number of Amyris's common stock outstanding as of March 31, 2018, have been granted to defendant Melo despite his breaches of fiduciary duty to the Company.

**THE TRUTH SLOWLY EMERGES**

102.     On November 13, 2018, the truth about the Company's grossly overestimated royalty revenues began to leak out, as Amyris issued a press release announcing disappointing results for the third quarter of 2018.  The press release revealed that licensing and royalty revenue, which had been driving the Company's reported growth, dropped from $18.3 million in the first half of 2018 to just $142,000 in the third quarter.  However, rather than acknowledge the Individual Defendants' misuse of ASC 606, defendant Melo instead attributed the poor results to the "volatility of the Vitamin E market." Even though he either knew or should have known that these weak trends would continue into the fourth quarter, defendant Melo falsely assured that the shortfall would be "made up with our core market revenue performance through year end."  The press release stated, in relevant part:

---

[2] On April 1, 2017, defendant Melo's target bonus level increased from 80% to 100% of annual base salary.  On June 1, 2017, defendant Melo's based salary increased from $550,000 to $600,000.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

- Q3 2018 GAAP revenue of $14.9 million, compared with GAAP revenue of $24.2 million for Q3 2017.  Third-quarter revenue of $14.9 million compared with the same period in 2017 of $22.5 million when adjusted for the loss making product sales on contracts assigned to DSM.

- Q3 2018 Adjusted gross margin of $8.2 million, or 55% of revenue, compared to Q3 of 2017 of $8.3 million, or 34%.

- Current quarter delivering at $200 million of annualized recurring revenue rate* with over 60% gross margin.  Doubling recurring revenue year on year while tripling adjusted gross margin dollars.

\*   \*   \*

EMERYVILLE, Calif., Nov. 13, 2018 (GLOBE NEWSWIRE) -- Amyris, Inc. (Nasdaq:AMRS), the industrial bioscience company, today announced preliminary unaudited financial results for the third quarter ended September 30, 2018.

"We are pleased with the rapid ramp up of our new, zero calorie sweetener product and our continued strong recurring revenue growth," said John Melo, President and CEO of Amyris. "However, *we are very disappointed with the volatility of the Vitamin E market and its direct impact on our third quarter revenue. Some of this shortfall is expected be made up with our core market revenue performance through year end*."

Continued Melo, "*While the unpredictable nature of the Vitamin E market and our royalty is disappointing*, we are very pleased by the strong growth of our Clean Beauty business, the early demand for our zero calorie sweetener and for the better than planned growth of our ingredients business. Our recurring revenue has been doubling year on year and we are on pace to deliver for the fourth quarter at an annualized rate of about $200 million in recurring revenue. This is double what we did in recurring revenue for the fourth quarter of last year and a great testament to the quality of our product portfolio and of our partnerships where we are delivering strong results. We are achieving this revenue growth from our product sales and long term partnerships while delivering three times the gross margin dollars year to date 2018 versus 2017 at this time. We expect strong continued recurring revenue growth where we control our destiny while delivering industry leading gross profit."

*(product and collaboration revenue connected to three year agreements or 10 year supply relationships)

103.    On the same day, Amyris held a conference call with analysts and investors to discuss the Company's third quarter results.  In his opening statement, defendant Melo ignored the Individual Defendants' responsibility for disappointing investors by overestimating royalty revenue due from Nenter via DSM.  The Individual Defendants had control over these estimations, and should have limited these figures to honestly represent what the Company realistically would be receiving in order to

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

prevent misleading and disappointing Amyris's investors.   Yet, defendant Melo blamed the

disappointment stemming from the poor results on "the Vitamin E royalty aspect of our business, an

activity outside of [their] control."   Further, despite routinely leading the public to anticipate a strong

year, with repeated assurances of continued increases in license and royalty revenue, defendant Melo

falsely professed the Individual Defendants "continued execution on the promises [that] we've made to

you."   Specifically, defendant Melo stated:

> Our third quarter results were disappointing.   ***We delivered strong results from the activities we controlled, with continued execution on the promises we've made to you, and very poor results from the Vitamin E royalty aspect of our business, an activity outside of our control***.
>
> *   *   *
>
> Since the start of 2018, we have had no direct involvement in the Vitamin E business. Short-term oversupply and selling price is the issue and a direct impact on our royalty revenue.   We expected around $15 million of royalty revenue in the third quarter and realized 0.

104.    On this news, Amyris's market capitalization plunged more than $29%, or $1.76 per

share, on November 14, 2018, to close at $4.14 per share compared to the previous trading day's closing

of $5.90 per share, erasing more than $126 million in market capitalization in a single day.

105.    On November 15, 2018, the Company filed its Quarterly Report on Form 10-Q for the

third quarter ended September 30, 2018 (the "Q3 2018 Form 10-Q") with the SEC.   The Q3 2018 Form

10-Q confirmed the disappointing results previously announced by Amyris.   The Company reported

revenue of $14.86 million and net loss of $68.32 million.   The Q3 2018 Form 10-Q reported license and

royalty revenue of $18.46 million for the nine months ended September 30, 2018.   Without ASC 606,

the Q3 2018 Form 10-Q revealed, that figure amounts to only $4.37 million.

106.    In addition, the Q3 2018 Form 10-Q stated that the Company's material weaknesses in

internal control over financial reporting previously disclosed in the 2017 Form 10-K have not yet been

remediated.   The Q3 2018 Form 10-Q falsely stated, "Otherwise, there were no changes in our internal

control over financial reporting during the fiscal quarter ended September 30, 2018 that have materially

affected, or are reasonably likely to materially effect, our internal control over financial reporting."   The

Q3 2018 Form 10-Q contained defendants Melo's and Valiasek's signed certifications pursuant to SOX

attesting to the accuracy of the report and the disclosure of any weakness or change in the Company's internal controls.

107.    Panicking to bring Amyris's revenue closer to their repeated expectations for 2018, the Individual Defendants sought to execute a last-minute deal.  On January 7, 2019, Amyris filed a Current Report on Form 8-K with the SEC announcing that on December 31, 2018, the Company entered into an assignment agreement (the "Assignment Agreement") with Hangzhou Xinfu Science & Tech Co. Ltd ("Xinfu") in an effort to assign the royalty agreement with DSM in exchange for a fixed price of $50 million.  In other words, the Assignment Agreement would enable the Company to book $50 million in license and royalty revenue in fiscal year 2018.

108.    Despite knowledge or reckless disregard of the Company's accounting failures, including overstated reported revenues, the Individual Defendants awarded cash bonuses to the Company's named executive officers ("NEOs") based on Amyris's performance for the year.  On February 22, 2019, Amyris filed a Current Report on Form 8-K with the SEC disclosing the Company's Leadership Development and Compensation Committee's approval of "cash bonus awards for the Company's [2018 fiscal year] to the NEOs, which included a cash bonus award to [defendant Melo] in the amount of $224,280."

109.    On March 18, 2019, the Company filed a Current Report on Form 8-K with the SEC. The Form 8-K announced the Assignment Agreement with Xinfu had been terminated "as a result of the failure of the parties to satisfy the Transfer Conditions."

110.    The March 18, 2019 Form 8-K also included the Company's press release issued the same day announcing Amyris's financial results for the fourth quarter and fiscal year ended December 31, 2018.  The press release announced fourth quarter revenue of $19.4 million and license and royalty revenue of $1.2 million.  For fiscal year 2018, the press release disclosed revenue of $80.4 million. Thus, the press release revealed that Individual Defendants missed their fiscal 2018 revenue guidance by 58%.  In the press release, defendant Melo noted that the "results for the quarter and year are below expectations."  Rather than acknowledge the Individual Defendants' responsibility for failing to meet stated expectations, defendant Melo blamed the negative results on the Assignment Agreement, a last-minute deal made on the final day of the year, falling through.  Defendant Melo stated, "The negative

results for the quarter and full year reflect the inability to recognize revenue for a $50 million multi-party Vitamin E deal in China during the fourth quarter."

111.    On March 19, 2019, the Company announced its inability to timely file its Annual Report for 2018, as Amyris filed yet another Notification of Late Filing on Form 12b-25 with the SEC.  The Form 12b-25 stated:

> Amyris, Inc. (the "Company") was unable to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2018 (the "Form 10-K") within the prescribed time period without unreasonable effort and expense *because of the significant time and resources that were devoted to the accounting for and disclosure of the significant transactions with Koninklijke DSM N.V. that closed in November 2018. The Company is also in the process of completing its evaluation of internal control over financial reporting for 2018 and finalizing related disclosures in the Form 10-K*. These activities delayed the completion of the Form 10-K.
>
> As previously reported in Part II, Item 9A, "Controls and Procedures" of the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2017, the Company has identified a *material weakness in its internal control* over financial reporting, which material weakness *remains unremediated* as of December 31, 2018. The Company is in the process of completing its evaluation of internal control over financial reporting and may have further deficiencies to report. In addition, the Company expects to continue to report that there is substantial doubt about its ability to continue as a going concern.

112.    On this news, Amyris's market capitalization plunged more than 41%, or $1.62 per share, on March 22, 2019, to close at $2.26 per share compared to closing of $3.88 per share on March 19, 2019, erasing more than $116.49 million in market capitalization in three days.

113.    Worse yet, on April 11, 2019, Amyris filed a Current Report on Form 8-K with the SEC announcing that the Company will its restate previous financial statements.  The Form 8-K reveals that the previously disclosed fiscal 2018 revenue of $80.4 million will be reduced by at least $12 million.  In addition, the Form 8-K warns investors that they "should no longer rely upon" the Company's Quarterly Reports on Forms 10-Q for the first, second, and third quarters of 2018, as the financial statements contained therein will be restated.

114.    In explaining the required restatements, the April 11, 2019 Form 8-K revealed that the Company made several material errors, including an error in estimating royalty revenue under ASC 606. In the Form 8-K, the Individual Defendants admitted an undisclosed material weakness in the Company's internal controls existed, stating that Amyris "expects to report material weaknesses in

addition to the material weaknesses reported in the [2017 Form 10-K]."  The Form 8-K stated, in relevant part:

> During the preparation and audit of the Company's consolidated financial statements for Fiscal 2018, the Company concluded that (i) *a material error was made related to the estimates for recognizing revenue for royalty payments under the Value Sharing Agreement, dated December 28, 2017 (the "Value Sharing Agreement"), as amended, between the Company and DSM under Accounting Standards Codification Topic 606, Revenue from Contracts with Customers, for the quarterly and year-to-date periods ended March 31, 2018 and June 30, 2018 and year-to-date period ended September 30, 2018,* (ii) material errors were made related to certain expenses that should have been identified and recorded as accrued liabilities in the fiscal quarter ended September 30, 2018 and (iii) material errors were made related to certain foreign currency transaction gains that should have been identified and recorded as other income in the quarterly and year-to-date periods ended June 30, 2018 and September 30, 2018. As a result, the Company anticipates that the restatement for these material errors and certain other matters will include a reduction in revenue and an increase in net loss for the Non-Reliance Periods as follows: approximately $4 million and $4 million, respectively, for the fiscal quarter ended March 31, 2018; approximately $8 million and $8 million, respectively, for the fiscal quarter ended June 30, 2018; approximately $1 million and $7 million, respectively, for the fiscal quarter ended September 30, 2018; approximately $12 million and $11 million, respectively, for the six months ended June 30, 2018; and approximately $13 million and $18 million, respectively, for the nine months ended September 30, 2018. The estimated impact to the financial statements of the errors could materially change based on further review and analysis of the Non-Reliance Periods, including the identification of additional material errors. *The Company is in the process of finalizing its evaluation of internal control over financial reporting and expects to report material weaknesses in addition to the material weakness reported in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2017. The Company has reached a conclusion that its system of internal control over financial reporting is not effective as of December 31, 2018*.

115.    On April 19, 2019, the Company filed a Current Report on Form 8-K with the SEC announcing an agreement to assign its royalty interest to DSM, with whom the Company previously shared royalty profits from Nenter.  DSM agreed to acquire the royalty agreement from Amyris for $57 million, $29.1 million of which would be paid in cash to Amyris.  The remaining $27.9 million would be used to pay off "certain existing obligations of the Company to DSM."

116.    Then, on May 16, 2019, Amyris filed a Current Report on Form 8-K with the SEC revealing that, in addition to the Company's Quarterly Reports for 2018, investors also should not rely upon the 2017 Form 10-K as the financial statements contained therein require restatement as well.  The Form 8-K revealed that the Company's preparation and audit of its Annual Report for 2018 unearthed

additional material accounting errors made in the previous year.  Specifically, the Individual Defendants failed to record between $17 million and $19 million as either a liability or charge to its consolidated statements of operations.  The Form 8-K stated, in relevant part:

> During the preparation and audit of the Company's consolidated financial statements for the fiscal year ended December 31, 2018, *senior management concluded that a material error had been made related to the accounting for certain payment obligations of the Company under the Partnership Agreement dated October 20, 2017* (the "*Ginkgo Agreement*"), between the Company and Ginkgo Bioworks, Inc. The contractual payment obligations of the Company under the Ginkgo Agreement and a related promissory note issued in connection therewith total $31.0 million over a five-year period ending on October 19, 2022 and had a present value of approximately $17.0 million to $19.0 million at the October 20, 2017 commitment date. *A significant portion of these payment obligations had not been recorded as a liability or charged to the consolidated statement of operations as of December 31, 2017*.

> On May 14, 2019, as a result of the error discussed above, the Board, upon the recommendation of the Audit Committee after consultation with senior management and KPMG, determined that the Company will restate its audited consolidated financial statements for the year ended December 31, 2017. *Accordingly, investors should no longer rely upon the Company's previously released consolidated financial statements for the 2017 Non-Reliance Period. In addition, investors should no longer rely upon earnings releases for this period and other communications relating to these consolidated financial statements. Further, the Company's disclosures related to such financial statements and related communications issued by or on behalf of the Company with respect to the 2017 Non-Reliance Period, including management's assessment of internal control over financial reporting as of December 31, 2017, should also no longer be relied upon*. Additionally, as previously reported, the Company expects to report material weaknesses in its internal control over financial reporting as of December 31, 2018. As a result of the material weaknesses, senior management concluded that the Company's internal control over financial reporting and disclosure controls and procedures were ineffective as of December 31, 2018. Additional material weaknesses may be identified, and the scope of financial items or periods required to be restated may be broadened. The Company expects that KPMG will complete its re-audit of fiscal year 2017 when it completes its audit of fiscal year 2018.

117.    Months later, Amyris has neither filed its Annual Report for 2018 nor restated its 2017 Form 10-K or any of its Quarterly Reports for 2018.

## INSIDER SALES BY DEFENDANTS

118.    Rather than providing the market with correct information, the Insider Selling Defendants used their knowledge of Amyris's material, nonpublic information to sell their personal holdings while the Company's stock was artificially inflated.  As officers and directors of Amyris, defendants were

- 44 -

privy to material, nonpublic information about the Company's true business health.

119.   While in possession of this knowledge, defendant Doerr sold 4,877,386 shares of his personally held Amyris stock for proceeds of over $30.33 million.[3]  Defendant Doerr's sales were timed to maximize profit from Amyris's then artificially inflated stock price.  Suspiciously, defendant Doerr's sales occurred on August 17, 2018, when Amyris stock traded at or near all-time highs of $6.22 per share.  Defendant Doerr's sales are also suspicious given that they represented 37.52% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 6,012,874 |
| Shares Sold During Sales Period ("SP") | 4,877,386 |
| Shares Disposed (Other) During SP | 0 |
| Total Shares Held During SP | 12,998,743 |
| Shares Remaining SP | 8,121,357 |
| **Total Proceeds from Sales** | **$30,331,488.06** |
| **% of Total Ownership Sold During SP** | **37.52%** |

120.   While in possession of material, nonpublic information, defendant Kung sold 3,924,884 of his personally held Company stock for proceeds of nearly $24.41 million.[4]  Defendant Kung's sales were timed to maximized profit from Amyris's then artificially inflated stock price.  Suspiciously, defendant Kung's sales occurred on August 17, 2018 and August 20, 2018, when Amyris stock traded at or near all-time highs of $6.22 per share.  Defendant Kung's sales are suspicious given that they represented 41.30% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 2,828,711 |
| Shares Sold During SP | 3,924,884 |
| Shares Disposed (Other) During SP | 0 |
| Total Shares Held During SP | 9,504,268 |
| Shares Remaining SP | 5,579,384 |
| **Total Proceeds from Sales** | **$24,408,068.62** |
| **% of Total Ownership Sold During SP** | **41.30%** |

---

[3] The sale was by Foris Ventures, LLC ("Foris").   Defendant Doerr indirectly holds all of the membership interests in Foris.

[4] These sales were by Vivo Capital VIII, LLC, of which defendant Kung is a voting member.  Defendant Kung may be deemed to share voting and dispositive power of the shares with four other voting members.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

121.    While in possession of material, nonpublic information, defendant Melo sold 27,550 of his personally held Amyris stock for proceeds of $186,655.55.  Defendant Melo's sales were timed to maximize profit from Amyris's then artificially inflated stock price.  Suspiciously, defendant Melo's sales occurred on July 16, 2018 and October 15, 2018, when Amyris stock traded at or near all-time highs of $6.61 per share and $7.50 per share, respectively.

122.    The Insider Selling Defendants' sales were timed to maximize profit from the Individual Defendants' overall scheme to artificially inflate Amyris's stock price.  Following the misleading statements made on March 15, 2018, the Company's stock price closed at $5.58 per share that day and rose to a closing price of $6.40 per share on the following day, representing a 14% increase.  Notably, in the period between March 15, 2018 and March 19, 2019, the Individual Defendants sold $54.92 million worth of their personally held stock.

123.    In sum, defendants Doerr, Kung, and Melo sold over $54.92 million worth of stock that was sold at artificially inflated prices as detailed by the table below:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| **DOERR**<br>**Current Director** | 8/17/2018 | 4,877,386 | $6.22 | $30,331,488.06 |
| | TOTAL: | 4,877,386 | | $30,331,488.06 |
| **KUNG**<br>**Current Director** | 8/17/2018 | 2,439,848 | $6.22 | $15,172,926.74 |
| | 8/17/2018 | 336,914 | $6.22 | $2,095,200.78 |
| | 8/20/2018 | 1,008,816 | $6.22 | $6,273,624.94 |
| | 8/20/2018 | 139,306 | $6.22 | $866,316.15 |
| | TOTAL: | 3,924,884 | | $24,408,068.62 |
| **MELO**<br>**Current Chief**<br>**Executive Officer,**<br>**President & Director** | 7/16/2018 | 22,355 | $6.61 | $147,703.96 |
| | 10/15/2018 | 5,195 | $7.50 | $38,951.59 |
| | TOTAL: | 27,550 | | $186,655.55 |
| | GRAND TOTAL: | 8,829,820 | | $54,926,212.22 |

## DAMAGES TO AMYRIS

124.    As a result of the Individual Defendants' improprieties, Amyris disseminated improper, public statements concerning the Company's revenues and internal controls.  These improper statements have devastated Amyris's credibility as reflected by the Company's almost $328 million, or 70%, market

1   capitalization loss from its October 2018 high to the present.

2        125.   Amyris's performance issues also damaged its reputation within the business community

3   and in the capital markets.  In addition to price, Amyris's current and potential investors consider a

4   company's trustworthiness, stability, and ability to evaluate known risks.  Investors are less likely to

5   invest in companies that disseminate improper statements, fail to comply with their own internal

6   protocols and regulations, and are uncertain about their own financial condition.  Accordingly, the

7   Company's ability to raise equity capital or debt on favorable terms in the future is now impaired.  In

8   addition, the Company stands to incur higher marginal costs of capital and debt because the improper

9   statements and misleading projections disseminated by the Individual Defendants have materially

10  increased the perceived risks of investing in and lending money to the Company.

11       126.   Further, as a direct and proximate result of the Individual Defendants' actions, Amyris

12  has expended, and will continue to expend, significant sums of money.  Such expenditures include, but

13  are not limited to:

14         (a)   costs incurred from the Company's review of accounting failures and insider

15  sales;

16         (b)   costs incurred from restating and revising past financial statements;

17         (c)   costs incurred from defending and paying any settlement in the class actions for

18  violations of federal securities laws;

19         (d)   costs incurred to investigate wrongdoing; and

20         (e)   costs incurred from compensation and benefits paid to the defendants who have

21  breached their duties to Amyris.

22              **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

23       127.   Plaintiff brings this action derivatively in the right and for the benefit of Amyris to

24  redress injuries suffered, and to be suffered, by Amyris as a direct result of violation of securities law,

25  breach of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and

26  abetting thereof, by the Individual Defendants.  Amyris is named as a nominal defendant solely in a

27  derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not

28  otherwise have.

128.   Plaintiff will adequately and fairly represent the interests of Amyris in enforcing and prosecuting its rights.

129.   Plaintiff was a stockholder of Amyris at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Amyris stockholder.

130.   The current Board of Amyris consists of the following twelve individuals: defendants Melo, Duyk, Doerr, Piwnica, Williams, Yang, Eykerman, Goppelsroeder, Kung, and Mills and nondefendants James McCann and Lisa Qi.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Defendants Melo, Doerr, Duyk, Piwnica, Williams, Yang, Eykerman, Goppelsroeder, Kung, and Mills Face a Substantial Likelihood of Liability for Their Misconduct**

131.   As alleged above, defendants Melo, Doerr, and Kung sold Amyris stock under highly suspicious circumstances.  These defendants, as directors of Amyris, possessed material, nonpublic company information and used that information to benefit themselves.  Defendants Melo, Doerr, and Kung sold stock based on this knowledge of material, nonpublic company information regarding the Company's woefully inaccurate financial statements, inadequate internal controls, and the impending decrease in the value of their holdings of Amyris.  Accordingly, defendants Melo, Doerr, and Kung face a substantial likelihood of liability for breach of their fiduciary duties of loyalty.  Any demand upon defendants Melo, Doerr, and Kung is futile.

132.   As alleged above, defendants Melo, Duyk, Doerr, Piwnica, Williams, Yang, Eykerman, Goppelsroeder, and Kung breached their fiduciary duties by negligently issuing the materially false and misleading 2018 Proxy soliciting the reelection of certain directors to the Board and approval of the CEO Equity Awards to the Company's stockholders.  Specifically, defendants Melo, Duyk, Doerr, Piwnica, Williams, Yang, Eykerman, Goppelsroeder, and Kung misrepresented or omitted: (i) the Board's risk oversight; (ii) defendant Melo's incentive to make short-term business decisions to inflate revenue for his personal interest; (iii) that the CEO Equity Awards would not align defendant Melo's interests with those of the Company's stockholders; and (iv) that the CEO Equity Awards would not promote the creation of long-term value.  Accordingly, defendants Melo, Duyk, Doerr, Piwnica,

1  Williams, Yang, Eykerman, Goppelsroeder, and Kung face a substantial likelihood of negligence

2  liability for issuing the 2018 Proxy and any demand upon these defendants is therefore futile.

3       133.   As alleged above, defendants Melo, Doerr, Duyk, Doerr, Piwnica, Williams, Yang,

4  Eykerman, Goppelsroeder, Kung, and Mills breached their fiduciary duties of loyalty by making

5  improper statements in the Company's press releases and SEC filings regarding concerning Amyris's

6  financial prospects, revenue, and internal control over financial reporting.   These statements were

7  improper because they knowingly or recklessly misstated and/or omitted material, adverse facts

8  concerning the Company's financial performance and condition, as well as the disclosure of any material

9  weaknesses or changes in the Company's internal controls.   The Company has already admitted that

10  each of its Quarterly Reports filed during 2018 should no longer be relied upon and that Amyris must

11  restate these financial statements, as material errors were made related to estimates for recognizing

12  royalty revenue.   Defendant Melo signed these Forms 10-Q attesting to the accuracy of the reports.

13       134.   Defendants Duyk, Williams, and Mills, as members of the Audit Committee, reviewed

14  and approved the improper statements and earnings guidance.   The Audit Committee's Charter provides

15  that it is responsible for the "oversight of the Company's accounting and system of internal controls."

16  Further, the Audit Committee Defendants are responsible for overseeing "the quality and integrity of the

17  Company's financial reports."   Thus, the Audit Committee Defendants were responsible for knowingly

18  or recklessly allowing the improper statements related to the Company's earnings guidance and financial

19  and disclosure controls.   Moreover, the Audit Committee Defendants reviewed and approved the

20  improper press releases made to the public.   Despite their knowledge or reckless disregard, the Audit

21  Committee Defendants caused these improper statements.   Accordingly, the Audit Committee

22  Defendants breached their fiduciary duty of loyalty and good faith because they participated in the

23  wrongdoing described herein.   Thus, defendants Duyk, Williams, and Mills face a substantial likelihood

24  of liability for their breach of fiduciary duties so any demand upon them is futile.

25       135.   Any suit by the current directors of Amyris to remedy these wrongs would expose

26  defendant Melo and Amyris to liability for violations of the federal securities laws in the pending

27  Securities Class Action, and would result in civil actions being filed against one or more of the other

28  Individual Defendants.   The Securities Class Action alleges violations of sections 10(b) and 20(a) of the

Exchange Act.  If the Board elects for the Company to press forward with its right of action against defendant Melo in this action, then Amyris's efforts would compromise its defense of the Securities Class Action.  Accordingly, demand on the Board is excused.

**Demand Is Excused Because Several Directors Cannot Conduct an Independent Investigation of the Wrongful Conduct**

136.   The Company admitted defendant Melo is not independent in the 2018 Proxy.  The principal professional occupation of defendant Melo is his employment with Amyris, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits as alleged above.   Accordingly, defendant Melo lacks independence from defendants Duyk, Doerr, Piwnica, Williams, Yang, Eykerman, Goppelsroeder, Kung, and Mills due to his interest in maintaining his executive position at Amyris.   This lack of independence renders defendant Melo incapable of impartially considering a demand to commence and vigorously prosecute this action.   Amyris paid defendant Melo the following compensation:

| Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2017 | $579,167 | $640,000 | $147,465 | $43,930 | $581,948 | $934 | $1,993,444 |

Accordingly, defendant Melo is incapable of impartially considering a demand to commence and vigorously prosecute this action because he has an interest in maintaining his principal occupation and the substantial compensation he receives in connection with that occupation.  Demand is futile as to defendant Melo.

137.   The Company also stated in the 2018 Proxy that "[defendants] Eykerman and Goppelsroeder are not independent because they are each employees of DSM."  The 2018 Proxy further explains the Company has a commercial and financial relationship with DSM.  Accordingly, defendants Eykerman and Goppelsroeder are incapable of impartially considering a demand.

138.   Defendant Doerr is not an independent director because he would risk the continued financial support of Amyris if he initiated litigation against defendant Melo or other Board members. Defendant Doerr is a partner of a venture capital firm, Kleiner Perkins Caufield & Byers and indirectly owns all the membership interest in Foris.  As of May 14, 2019, Foris held 18,540,044 shares of Amyris

common stock representing 18.9% of the Company's outstanding shares.  As a venture capitalist, defendant Doerr will not sue CEOs of the companies he is invested in given the fierce competition in the industry to find suitable investments.  Venture capitalists are aware that their investment opportunities would become even scarcer if CEOs believed that they could be sued by them.  Thus, defendant Doerr will not initiate litigation against defendant Melo because he controls Foris and would be at a risk of losing future investment opportunities with the Company if such a suit occurred.

139.    Defendant Kung is also incapable of impartially considering a demand.  Defendant Kung is the founding partner of Vivo Capital LLC ("Vivo").  As of April 29, 2019, Vivo and its affiliated funds held 6,489,314 shares of the Company's stock, representing 6.6% of the Company's outstanding shares.  As the Company stated in the 2018 Proxy, "[defendant] Kung is a founding member of Vivo and a voting member of the general partner of Vivo entities that hold our common stock, Series D Preferred Stock and warrants, and may be deemed to share voting and dispositive power over the shares held by such entities."  Like defendant Doerr, defendant Kung will not sue CEOs of the companies he is invested in, as it may risk his future investment opportunities.

140.    Defendant Piwnica is another director that has a financial interest in not pursuing litigation against defendant Melo and other Board members.  Defendant Piwnica is a director of NAXOS US, and she has been designated by that company to serve as its representative on Amyris's Board.  Throughout the years, Naxyris S.A. ("Naxyris") (a subsidiary of NAXOS UK) has used defendant Piwnica to attain financial advantages deals from Amyris.  In July 2015, Naxyris entered into a Securities Purchase Agreement with Foris and another entity to purchase certain of Amyris shares.  Under that agreement, Naxyris was able to receive stocks at a heavily discounted rate of $1.56 per share and $0.01 per share for certain stocks even though the Company's common stock was trading at over $23 per share.  Under defendant Melo's tenure, Naxyris derived substantial benefits from through its deals with Amyris.  As a result, defendant Piwnica cannot impartially consider initiating litigation against defendant Melo and other members of the Board.

141.    Plaintiff has not made any demand on the other stockholders of Amyris to institute this action since such demand would be a futile and useless act for at least the following reasons:

1    (a)    Amyris is a publicly held company with over 92.7 million shares outstanding and

2 thousands of stockholders;

3    (b)    making demand on such a number of stockholders would be impossible for

4 plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

5    (c)    making demand on all stockholders would force plaintiff to incur excessive

6 expenses assuming all stockholders could be individually identified.

7    ## COUNT I

8    **Against the Director Defendants for Violation of Section 14(a) of the Exchange Act**

9    142.    Plaintiff incorporates by reference and realleges each and every allegation contained

10 above, as though fully set forth herein.

11    143.    The section 14(a) Exchange Act claims alleged herein are based solely on negligence.

12 They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director

13 Defendants.  The section 14(a) Exchange Act claims detailed herein do not allege and do not sound in

14 fraud.  Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to

15 any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

16    144.    The Director Defendants negligently issued, caused to be issued, and participated in the

17 issuance of materially misleading written statements to stockholders which were contained in the 2018

18 Proxy.  In the 2018 Proxy, the Board solicited stockholder votes to reelect defendants Melo, Eykerman,

19 Kung, and Williams to the Board and approve the CEO Equity Awards.

20    145.    The 2018 Proxy, however, misrepresented and failed to disclose: (i) the Board's

21 accounting failures resulting in unwarranted compensation to defendant Melo; (ii) Amyris executives'

22 incentive to inflate the Company's revenue; (iii) the Board's risk oversight; and (iv) the Company's

23 inadequate internal controls which facilitated the illegal behavior described herein.  By reasons of the

24 conduct alleged herein, the Director Defendants violated section 14(a) of the Exchange Act.  As a direct

25 and proximate result of these defendants' wrongful conduct, Amyris misled and deceived its

26 stockholders by making misleading statements that were essential links in stockholders heeding to the

27 Company's recommendation to approve the CEO Equity Awards.

28

146.    The misleading information contained in the 2018 Proxy was material to Amyris's stockholders in determining whether or not to reelect certain Board members and approve the CEO Equity Awards.  The proxy solicitation process in connection with the 2018 Proxy was an essential link in the approval of the CEO Equity Awards.

147.    Plaintiff, on behalf of Amyris, thereby seeks relief for damages inflicted upon the Company based upon the misleading 2018 Proxy in connection with the improper approval of the CEO Equity Awards.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

148.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

149.    The Individual Defendants owed and owe Amyris fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Amyris the highest obligation of good faith, fair dealing, loyalty, and due care.

150.    The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within Amyris, and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

151.    The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.  The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing that: (i) the Company was unable to estimate royalty revenue on certain transactions; (ii) the reported licensing and royalty revenues were overestimated; (iii) Amyris would need to restate financial statements; that there was an undisclosed material weakness in Amyris's internal controls; and (iv) as a result of the foregoing, the Company's representations concerning its financial results, business prospects, and internal controls were improper. Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

152.    The Director Defendants, as directors of the Company, owed Amyris the highest duty of loyalty.  These defendants breached their duty of loyalty by recklessly permitting the Company to

disseminate improper statements.  The Director Defendants knew or were reckless in not knowing that: (i) the Company was unable estimate royalty revenue on certain transactions; (ii) the reported licensing and royalty revenues were overestimated; (iii) Amyris would need to restate financial statements; that there was an undisclosed material weakness in Amyris's internal controls; and (iv) as a result of the foregoing, the Company's representations concerning its financial results, business prospects, and internal controls were improper.  Accordingly, these defendants breached their duty of loyalty to the Company.

153.    The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.  The Audit Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

154.    The Insider Selling Defendants breached their duty of loyalty by selling Amyris stock on the basis of the knowledge of the improper information described above before that information was revealed to the Company's stockholders.  The information described above was material, nonpublic information concerning the Company's future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Amyris common stock.

155.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Amyris has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

156.    Plaintiff, on behalf of Amyris, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Waste of Corporate Assets

157.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

158.    As a result of the misconduct described above, the Individual Defendants have wasted corporate assets by forcing the Company to expend valuable resources in defending itself in the

Securities Class Action that they brought on with their improper statements.  In addition, due to the Individual Defendants' mismanagement, the Company has been forced to interrupt its business and dedicate its resources and attention to restating and revisiting its past financial statements.

159.    As a result of the decision to allow the Company to operate in an environment devoid of adequate internal and financial controls, the Individual Defendants have caused Amyris to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

160.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

161.    Plaintiff, on behalf of Amyris, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

162.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

163.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Amyris.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Amyris.

164.    The Insider Selling Defendants sold Amyris stock while in possession of material, nonpublic information that artificially inflated the price of Amyris stock.  As a result, the Insider Selling Defendants profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

165.    Plaintiff, as a stockholder and representative of Amyris, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

166.    Plaintiff, on behalf of Amyris, has no adequate remedy at law.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

# PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Amyris, demands judgment as follows:

A.      Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' violation of securities law, breach of fiduciary duty, waste of corporate assets, and unjust enrichment;

B.      Ordering defendants to provide to plaintiff and the investing public accurate operational reports and financial statements for all previous quarters and year identified as inaccurate;

C.      Ordering defendants to take whatever measures are reasonably necessary to ensure they publish timely and accurate operational reports and financial statements for all quarterly and annual periods going forward;

D.      Directing Amyris to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Amyris and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.      a proposal to strengthen the Company's controls over financial reporting;

2.      a proposal to strengthen Amyris's oversight of its disclosure procedures;

3.      a provision to control insider selling;

4.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

5.      a provision to permit the stockholders of Amyris to nominate at least three candidates for election to the Board.

E.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Amyris has an effective remedy;

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1     F.     Awarding to Amyris restitution from defendants, and each of them, and ordering

2 disgorgement of all profits, benefits, and other compensation obtained by the defendants, including all

3 ill-gotten gains from insider selling by defendants;

4     G.     Awarding to plaintiff the costs and disbursements of the action, including reasonable

5 attorneys' fees, accountants' and experts' fees, costs, and expenses; and

6     H.     Granting such other and further relief as the Court deems just and proper.

7 <u>**JURY DEMAND**</u>

8     Plaintiff demands a trial by jury.

9 Dated: June 21, 2019

             ROBBINS ARROYO LLP
10             BRIAN J. ROBBINS
             CRAIG W. SMITH
11             STEVEN R. WEDEKING

12                  /s/*Brian J. Robbins*
                  BRIAN J. ROBBINS
13

14             5040 Shoreham Place
             San Diego, CA 92122
15             Telephone: (619) 525-3990
             Facsimile: (619) 525-3991
16             E-mail: brobbins@robbinsarroyo.com
                    csmith@robbinsarroyo.com
17                    swedeking@robbinsarroyo.com

18             Attorneys for Plaintiff

19

20

21

22

23

24

25

26

27 1356959

28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

## VERIFICATION

I, Wayne Bonner, hereby declare as follows:

I am the plaintiff in the within entitled action.  I have read the Verified Stockholder Derivative Complaint for Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment.  Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 06/20/2019

WAYNE BONNER